## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **JONATHAN WEAVER** and **JENNIFER CARTER,** on behalf of themselves and all others similarly situated, | Case No.  3:24-cv-01915 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| **SNOWFLAKE, INC. and AT&T INC.,** | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Jonathan Weaver and Jennifer Carter ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Snowflake, Inc. ("Snowflake") and AT&T Inc. ("AT&T) (collectively, "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

### I.     INTRODUCTION

1.     Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard Plaintiffs' and other similarly situated AT&T current and former customers' records of phone numbers from call and text communications (the "Private Information") from hackers.

2.     Snowflake is a cloud storage service used by 9,437 customers, which are often large global companies which, in addition to AT&T, include Adobe, Kraft Heinz, Mastercard, HP, Nielsen, Novartis, PepsiCo, Siemens, and NBC Universal.

3.     AT&T is a multinational telecommunications corporation and, with its subsidiaries

and affiliates, is one of the United States's most popular wireless carriers and Internet providers.

4.      On or about July 12, 2024, AT&T filed official notice of a hacking incident with the U.S. Securities Exchange Commission.

5.      On or about the same time, AT&T also sent out data breach letters to individuals whose information was compromised as a result of the hacking incident.

6.      Based on the Notice filed by AT&T,  between April 14, 2024, and April 25, 2024, a cybercriminal began a series of hacks into its vendor, Snowflake's, systems, ultimately obtaining 380 million customer profiles that included the sensitive PII of approximately 110 million current and former customers of AT&T, including Plaintiffs' and Class Members.[1]

7.       Defendants did not use reasonable security or monitoring procedures and practices appropriate to the nature of the sensitive information they were collecting from, and maintaining for, Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of PII.

8.      As evidenced by the Data Breach, the PII contained in Snowflake's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

9.      Plaintiffs and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

10.      The Private Information compromised in the Data Breach included highly sensitive data that Defendants collected and maintained.

---

[1] *See* https://www.cnbc.com/2024/07/12/snowflake-shares-slip-after-att-says-hackers-accessed-data.html  (last visited July 23, 2024).

11.     There has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficient to avoid a similar breach in the future.

12.     Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

13.     Plaintiffs bring this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and that such information was subject to unauthorized access by cybercriminals.

14.     The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

15.     Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

16.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

17.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence, negligence *per se*, breach of contract, breach of implied contract, unjust enrichment, breach of third-party beneficiary contract, and declaratory judgment.

## II.     PARTIES

18.     Plaintiff Jonathan Weaver is, and at all times mentioned herein was, an individual citizen of the State of Louisiana.

19.     Plaintiff Jennifer Carter is, and at all times mentioned herein was, an individual citizen of the State of Louisiana.

20.     Defendant Snowflake Inc. is a Delaware corporation with its principal place of business located at 106 E. Babcock Street, Suite 3A, Bozeman, Montana, 59715.

21.     Defendant AT&T Inc. is a Delaware corporation with its principal place of business located at 208 S. Akard St, Dallas, Texas, 75202.

## III.     JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23.     The Court has specific personal jurisdiction over Defendant Snowflake because it has availed itself of the rights and benefits of the state of Texas by conducting substantial business in this forum, including but not limited to, business with its client, AT&T.

24.     The Court has general personal jurisdiction over Defendant AT&T because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in this District.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Defendants has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A. Defendants' Business and Collection of Plaintiffs' and Class Members' Private Information

26.     Defendant Snowflake is a data warehousing company. Founded in 2012, Snowflake has over 9,800 global customers. Defendants employs more than 7,000 people and generates approximately $3 billion in annual revenue.

27.     Defendant AT&T is a large internet and telecommunications provider. Founded in 1983, AT&T is one of the nation's largest fiber-optics internet providers serving over one hundred million customers. AT&T employs more than 149,900 people and generates approximately $122 billion in annual revenue.

28.     As a condition of receiving internet and telecommunication services, AT&T requires that its customers entrust it with highly sensitive personal information. In the ordinary course of receiving service from AT&T, Plaintiffs and Class Members were required to provide their Private Information to AT&T.

29.     In AT&T's Data Incident notice letter, AT&T stated that "[p]rotecting customer data is a top priority. . . . We hold ourselves to high privacy standards."[2] In its Privacy Policy,

---

[2] *See* Notice Letter.

AT&T states "[w]e work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment."[3]

30.     Because of the highly sensitive and personal nature of the information AT&T acquires and stores with respect to its customers, Defendant, upon information and belief, promises to, among other things: keep customers' Private Information private; comply with industry standards related to data security and the maintenance of its customers' Private Information; inform its customers of its legal duties relating to data security and comply with all federal and state laws protecting customers' Private Information; only use and release customers' Private Information for reasons that relate to the services it provides; and provide adequate notice to customers if their Private Information is disclosed without authorization.

31.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

32.     Plaintiffs and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendant ultimately failed to do.

**B.  <u>The Data Breach and Defendants' Inadequate Notice to Plaintiffs and Class Members</u>**

33.     According to AT&T's Notice, it learned of unauthorized access to Snowflake's computer systems on or around April of 2024, with such unauthorized access having taken place between April 14, 2024 and April 25, 2024.

---

[3] *See* https://about.att.com/privacy/privacy-notice.html#data-retention (last visited July 23, 2024).

34.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including text and call phone number records from May 1, 2022 through October 31, 2022.

35.     On or about July 12, 2024, roughly three months after Defendants learned that the Class's Private Information was first accessed by cybercriminals, Defendants finally began to notify customers that their investigation determined that their Private Information was accessed.

36.     AT&T delivered Data Breach Notification Letters to Plaintiffs and Class Members, alerting them that their highly sensitive Private Information had been exposed in a "Data Incident."

37.     Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

38.     Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

39.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

40.     Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

**C.  Defendants Failed to Comply with FTC Guidelines**

41.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and

appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

42.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

43.     The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

44.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

46.     Defendants were at all times fully aware of their obligation to protect the Private Information of their customers and their customers' clients, yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**D.   <u>Defendants Failed to Comply with Industry Standards</u>**

47.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

48.     Some industry best practices that should be implemented by businesses like Defendants include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

49.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

50. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

51. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**E. Defendants Breached their Duty to Safeguard Plaintiffs' and Class Members' Private Information**

52. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including complying with industry standards and requirements, training for their staff, and ensuring that their computer systems, networks, and protocols adequately protected the Private Information of Class Members

53. Defendants breached their obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b. Failing to adequately protect customers' Private Information;

  c. Failing to properly monitor their own data security systems for existing intrusions;

  d. Failing to sufficiently train their employees regarding the proper handling of their customers' and clients' customers' Private Information;

  e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

  f. Failing to adhere to industry standards for cybersecurity as discussed above; and

  g. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

54. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

55. Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

56. Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

**F. <u>Defendants Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft</u>**

57. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such

as data breaches or unauthorized disclosure of data.[4] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

58.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

59.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

60.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

---

[4] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on July 23, 2024).

Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

61.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

62.     One such example of this is the development of "Fullz" packages.

63.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

64.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information are being misused, and that such misuse is fairly traceable to the Data Breach.

65.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[5] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

66.     PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

67.     The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[6] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry.

68.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details

---

[5] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited July 23, 2024).
[6] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited on July 23, 2024).

have a price range of $50 to $200.[7] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[8]

69.     Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker.  Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual.  It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[9]

70.     The Dark Web Price Index of 2022, published by PrivacyAffairs[10] shows how valuable just email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
| --- | --- |
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

---

[7] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on July 23, 2024).

[8] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on July 23, 2024).

[9] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on July 23, 2024).

[10] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/ (last visited on July 23, 2024).

71.     Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails.  If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

72.     Likewise, the value of PII is increasingly evident in our digital economy.  Many companies including Defendants collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and shares it with third parties for similar purposes.[11]

73.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[12]

74.     Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

75.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

---

[11] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on July 23, 2024).

[12] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

76.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

77.     A study by the Identity Theft Resource Center[13] shows the multitude of harms caused by fraudulent use of PII:



78.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[14]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on

---

[13] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited July 23, 2024).

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited July 23, 2024).

the Web, fraudulent use of that information may continue for years.
As a result, studies that attempt to measure the harm resulting from
data breaches cannot necessarily rule out all future harm.

79.     PII is such a valuable commodity to identity thieves that once the information has

been compromised, criminals often trade the information on the "cyber black market" for years.

80.     As a result, Plaintiffs and Class Members are at an increased risk of fraud and

identity theft for many years into the future. Thus, Plaintiffs and Class Members have no choice

but to vigilantly monitor their accounts for many years to come.

**G. Plaintiffs' and Class Members' Damages**

*Plaintiff Jonathan Weaver's Experience*

81.     When Plaintiff Weaver first became a customer of AT&T, he was required to

provide it with substantial amounts of her PII, which AT&T also entrusted to Snowflake as part of

both Defendants' business practices.

82.     On or about July 12, 2024, Plaintiff Weaver received a letter from AT&T which

told him that his Private Information had been involved during the Data Breach. The notice letter

informed him that the Private Information compromised included the "phone numbers of your call

and text interactions from May 1, 2022 to October 31, 2022. It also included counts of those

calls/texts and total call durations for specific days or months."

83.     Plaintiff Weaver suffered actual injury in the form of time spent dealing with the

Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his

accounts for fraud.

84.     Plaintiff Weaver would not have provided his Private Information to AT&T had it

timely disclosed that its systems lacked adequate computer and data security practices to safeguard

18

its customers' personal information from theft, and that those systems were subject to a data breach.

85. Plaintiff Weaver suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach.

86. Plaintiff Weaver suffered actual injury in the form of damages to and diminution in the value of his personal information – a form of intangible property that Plaintiff Weaver entrusted to AT&T for the purpose of receiving internet and telecommunication services from AT&T and which was compromised in, and as a result of, the Data Breach.

87. Plaintiff Weaver suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by him Private Information being placed in the hands of criminals.

88. Plaintiff Weaver has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches.

89. As a result of the Data Breach, Plaintiff Weaver made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing his personal and financial accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Weaver has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

90. As a result of the Data Breach, Plaintiff Weaver has suffered anxiety as a result of the release of his Private Information to cybercriminals, which Private Information he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him. Plaintiff Weaver is very concerned about this

increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on his life.

91.     Plaintiff Weaver also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from Plaintiff Weaver; (b) violation of his privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud he now faces.

92.     As a result of the Data Breach, Plaintiff Weaver anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Jennifer Carter's Experience*

93.     When Plaintiff Carter first became a customer of AT&T, she was required to provide it with substantial amounts of her PII, which AT&T also entrusted to Snowflake as part of both Defendants' business practices.

94.     On or about July 12, 2024, Plaintiff Carter received a letter from AT&T which told her that her Private Information had been involved during the Data Breach. The notice letter informed her that the Private Information compromised included the "phone numbers of your call and text interactions from May 1, 2022 to October 31, 2022. It also included counts of those calls/texts and total call durations for specific days or months."

95.     Plaintiff Carter suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

96.     Plaintiff Carter would not have provided her Private Information to AT&T had it timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' personal information from theft, and that those systems were subject to a data breach.

97.     Plaintiff Carter suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

98.     Plaintiff Carter suffered actual injury in the form of damages to and diminution in the value of her personal information – a form of intangible property that Plaintiff Carter entrusted to AT&T for the purpose of receiving internet and telecommunication services from AT&T and which was compromised in, and as a result of, the Data Breach.

99.     Plaintiff Carter suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

100.    Plaintiff Carter has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

101.    As a result of the Data Breach, Plaintiff Carter made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing personal and financial accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Carter has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

102.    As a result of the Data Breach, Plaintiff Carter has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about

unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Carter is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

103.    Plaintiff Carter also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Carter; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

104.    As a result of the Data Breach, Plaintiff Carter anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

105.    In sum, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

106.    Plaintiffs and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

107.    Plaintiffs' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

108.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, multiple forms of identity theft.

109.    Further, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to spend time dealing with the effects of the Data Breach.

110.    Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

111.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

112.    Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiffs and Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of Defendants' system and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive what they paid for.

113.    Additionally, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

114.     Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

115.     Additionally, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[15] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[16]

116.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

117.     Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiffs and Heartland included

---

[15] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on July 23, 2024).

[16] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 23, 2024).

Defendant's contractual obligation to provide adequate data security, which Defendant failed to provide. Thus, Plaintiffs and Class Members did not get what they bargained for.

118.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

119.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

121.    Specifically, Plaintiffs propose the following Nationwide Class definition (referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

122.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

123.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Nationwide Class and add subclasses before the Court determines whether certification is appropriate.

124.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

125.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of approximately 110,000,000 customers of AT&T whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

126.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    When Defendants learned of the Data Breach;

    c.    Whether Defendants' response to the Data Breach was adequate;

    d.    Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

    e.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f.   Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.   Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h.   Whether Defendants owed a duty to Class Members to safeguard their Private Information;

i.   Whether Defendants breached its duty to Class Members to safeguard their Private Information;

j.   Whether hackers obtained Class Members' Private Information via the Data Breach;

k.   Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

l.   Whether Defendants breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m.  Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

n.   What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

o.   Whether Defendants' conduct was negligent;

p.   Whether Defendants' conduct was *per se* negligent;

q.   Whether Defendants were unjustly enriched;

r.   Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

127.  Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

128.  Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

129.  Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

130.  Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

28

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

131.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

132.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VI.    <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>
### NEGLIGENCE
### (On behalf of Plaintiffs and the Nationwide Class)

133.    Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

134.    Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

135.    Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security.

Defendants were on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

136.   Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

   a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

   b.   To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

   c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

   d.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the FTCA;

   e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

   f.   To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

137.   Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

138.   Defendants' duty also arose because Defendants were bound by industry standards to protect their customers' and client's customers' confidential Private Information.

139.     Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

140.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

141.     Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

142.     Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

143.     Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.   Failing to adequately monitor the security of their networks and systems;

c.   Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' Private Information;

e.   Failing to comply with the FTCA;

   f.   Failing to detect in a timely manner that Class Members' Private Information had

        been compromised; and

144.   Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs'

and Class Members' willingness to entrust Defendants with their Private Information was

predicated on the understanding that Defendants would take adequate security precautions.

Moreover, only Defendants had the ability to protect their systems (and the Private Information

stored on them) from attack.

145.   Defendants' breach of duties owed to Plaintiffs and Class Members caused

Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated as alleged

herein.

146.   As a result of Defendants' ongoing failure to notify Plaintiffs and Class Members

regarding exactly what Private Information has been compromised, Plaintiffs and Class Members

have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

147.   Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs

and Class Members of identity theft, loss of control over their Private Information, and/or loss of

time and money to monitor their accounts for fraud.

148.   As a result of Defendants' negligence in breach of their duties owed to Plaintiffs

and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their

Private Information, which is still in the possession of third parties, will be used for fraudulent

purposes.

149.   Defendants also had independent duties under state laws that required it to

reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify

them about the Data Breach.

32

150.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

151.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

152.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

153.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On behalf of Plaintiffs and the Nationwide Class)

154.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

155.    Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

156.    Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

157.    Plaintiffs and Class Members are within the class of persons that the FTCA is intended to protect.

158.   The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendants' duty in this regard.

159.   Defendants violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

160.   It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

161.   Defendants' violations of the FTCA constitute negligence *per se*.

162.   Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

163.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

164.    Defendants breached their duties to Plaintiffs and the Class under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

165.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

166.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT III
### BREACH OF CONTRACT
### (Against AT&T on behalf of Plaintiffs and the Nationwide Class)

167.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

168.    Plaintiffs and Class Members entered into a valid and enforceable contract through which they paid money to Defendant AT&T in exchange for services. That contract included promises by AT&T to secure, safeguard, and not disclose Plaintiffs' and Class Members' Private Information.

169.    AT&T's Privacy Policy memorialized the rights and obligations of AT&T and its customers. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

170.    In the Privacy Policy, AT&T commits to protecting the privacy and security of private information and promises to never share Plaintiffs' and Class Members' Private Information except under certain limited circumstances.

171.     Plaintiffs and Class Members fully performed their obligations under their contracts with AT&T.

172.     However, AT&T did not secure, safeguard, and/or keep private Plaintiffs' and Class Members' Private Information, and therefore AT&T breached its contracts with Plaintiffs and Class Members.

173.     AT&T allowed third parties to access, copy, and/or exfiltrate Plaintiffs' and Class Members' Private Information without permission. Therefore, AT&T breached the Privacy Policy with Plaintiffs and Class Members.

174.     AT&T's failure to satisfy its confidentiality and privacy obligations resulted in AT&T providing services to Plaintiffs and Class Members that were of a diminished value.

175.     As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including in AT&T's failure to fully perform its part of the bargain with Plaintiffs and Class Members.

176.     As a direct and proximate result of AT&T's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

177.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

<u>**COUNT IV**</u>
**BREACH OF IMPLIED CONTRACT**
**(Against AT&T on behalf of Plaintiffs and the Nationwide Class)**

178.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

179.     This Count is pleaded in the alternative to Count III above.

36

180.    Defendant AT&T provides telecommunication and data storage services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members paying for services from Defendant.

181.    Through Defendant's sale of services, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with Defendant's policies, practices, and applicable law.

182.    As consideration, Plaintiffs and Class Members paid money to AT&T and turned over valuable Private Information to it. Accordingly, Plaintiffs and Class Members bargained with Defendant to securely maintain and store their Private Information.

183.    Defendant AT&T accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

184.    In delivering their Private Information to Defendant and paying for services, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard the Private Information as part of that service.

185.    Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

186.    Plaintiffs and Class Members would not have entrusted their Private Information to AT&T in the absence of such an implied contract.

187.    Had AT&T disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to AT&T.

188.    Defendant recognized that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and the other Class Members.

189.    Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information.

190.    Plaintiffs and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

191.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

192.    This Count is pleaded in the alternative to Counts III and IV above.

193.    Plaintiffs and Class Members conferred a benefit on Defendants by turning over their Private Information to Defendants and/or by paying for products and services that should have included cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protections from either Defendants.

194.    Upon information and belief, Defendants fund their data security measures entirely from their general revenues, including from payments made by Plaintiffs and Class Members.

195. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

196. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received that should have been used for adequate cybersecurity practices that they failed to provide.

197. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the transactions alleged herein and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

198. If Plaintiffs and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

199. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

200. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

201. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

202. Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VI
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (On behalf of Plaintiffs and the Nationwide Class)

203. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

204. Snowflake entered into contracts, written or implied, with its clients such as AT&T to perform services that include, but are not limited to, providing data storage. Upon information and belief, these contracts are virtually identical between and among Snowflake and its clients

around the country whose customers, including Plaintiffs and Class Members, were affected by the Data Breach.

205.     In exchange, Snowflake agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

206.     These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Snowflake and its clients. Snowflake knew that if it were to breach these contracts with its clients, the clients' customers—Plaintiffs and Class Members—would be harmed.

207.     Snowflake breached the contracts it entered into with its clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiffs and Class Members thereof.

208.     Plaintiffs and the Class were harmed by Snowflake's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

209.     Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

<u>**COUNT VII**</u>
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

210.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

211.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal statutes described in this Complaint.

212.    Defendants owe a duty of care to Plaintiffs and Class Members, which required them to adequately secure Plaintiffs' and Class Members' Private Information.

213.    Defendants still possess Private Information belonging to Plaintiffs and Class Members.

214.    Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

215.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.  Defendants owe a legal duty to secure their customers' and clients' customers' Private Information and to timely notify them of a data breach under the common law and Section 5 of the FTCA;

    b.  Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the Private Information entrusted to them; and

    c.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure the Private Information entrusted to them.

216.   This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a.   Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.   Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

    i.   engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    ii.   engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.   auditing, testing, and training their security personnel regarding any new or modified procedures;

    iv.   segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

    v.   conducting regular database scanning and security checks;

vi.     routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating their users about the threats they face with regard to the security of their Private Information, as well as the steps Defendants' customers should take to protect themselves.

217.    If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

218.    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

219.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendants, thus preventing future injury to Plaintiffs and other customers whose Private Information would be further compromised.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class requested herein;

b.  Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

45

DATED:  July 26, 2024                     Respectfully submitted,


                                          By: */s/ Bruce W. Steckler*
                                          **STECKLER WAYNE & LOVE PLLC**
                                          BRUCE W. STECKLER
                                          12720 Hillcrest Suite 1045
                                          Dallas, Texas 75230
                                          Telephone: (972) 387-4040
                                          Facsimile: (972) 387-4041
                                          bruce@stecklerlaw.com


                                          Tyler J. Bean
                                          **SIRI & GLIMSTAD LLP**
                                          745 Fifth Avenue, Suite 500
                                          New York, New York 10151
                                          Tel: (212) 532-1091
                                          E: tbean@sirillp.com